# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 25, 2013

No. 12-70024

Lyle W. Cayce
Clerk

TAI CHIN PREYOR,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:10-CV-857

Before JOLLY, DAVIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Tai Chin Preyor was convicted and sentenced to death in Texas for the
2004 capital murder of Jami Tackett while in the course of committing and
attempting to commit burglary. He requests a certificate of appealability (COA)
to appeal the district court's denial of federal habeas relief. The request for a
COA is DENIED for the reasons that follow.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 12-70024

I.

The State presented the following evidence at trial. Over an extended period of time the victim, Jami Tackett, sold illegal drugs to Preyor, who then sold them to others. On February 25, 2004, Preyor, whose nickname was "Box," called Tackett and said that he was coming to her apartment that night. Tackett was entertaining friends, including Jason Garza, at her apartment. After the last guest left at about 4:00 a.m. on February 26, Tackett and Garza locked the front door, turned out the lights, and went to bed. Garza testified that when they were almost asleep, he heard two or three loud bangs at the door. Then a man peeked into the bedroom and Tackett said, "Box, what the hell are you doing here." Preyor, who was dressed in black and wearing a hood and gloves, said "F*** this," and attacked Garza. After Preyor stabbed Garza, Garza escaped and asked neighbors to call for help. Preyor then stabbed Tackett numerous times and cut her throat, severing her trachea, jugular vein, and carotid artery.

Several of Tackett's neighbors heard her screaming and saw Preyor when he left her apartment. They saw Tackett on the floor, covered in blood and making gurgling sounds. Jaclyn Villanueva asked Tackett if the man who came out of the apartment wearing black clothing hurt her. Although Tackett was unable to speak, she nodded her head affirmatively. Tackett died before the paramedics arrived.

Preyor left Tackett's apartment and went downstairs, where his vehicle was parked, but returned to Tackett's apartment where he apparently searched, unsuccessfully, for his keys. After the murder, David Pointer, Tackett's former boyfriend, found some car keys in her apartment and turned them over to the police, who determined that they were the keys to Preyor's vehicle.

When Preyor left Tackett's apartment the second time, he encountered police officers. When they ordered him to stop and get on the ground, Preyor

2

refused to comply. The police had to use pepper spray to subdue him. Preyor was covered in blood, which DNA analysis later indicated was Tackett's.

Police found Preyor's gloves and the murder weapon on the ground next to a vehicle in the parking lot, later identified as Preyor's vehicle. They also discovered a loaded shotgun on the bumper of the vehicle and found blood on the driver's-side door handle of the vehicle. The pattern on Preyor's boots matched the pattern of the bloody footprints found in Tackett's apartment. Tackett's DNA profile was also consistent with blood found on the knife, gloves, car door handle, a swab from Preyor's face, and a swab from his hand and boot. Garza's DNA profile was consistent with blood found on Preyor's watch and knit cap. Blood consistent with a mixture of Tackett's and Preyor's DNA profiles was located on various items, including a nail clipping from Tackett and a swab from Preyor's face.

At trial, Detective Barney Whitson read aloud the statement Preyor made to the police after he was taken into custody, quoted below in relevant part:

> The truth about what happened was I went over to Jami's to buy some drugs from her. Jami was my connect. I buy my drugs from her and I sell them to people I know. This morning I went over to Jami's apartment to buy some drugs. I had called Jami earlier that day and asked her what was up. Jami told me nothing. Jami told me I needed to come and talk to her. Jami told me she had company, so I told her I would hook up with her later. It was about 11:30 p.m. on Wednesday that I talked to Jami. When I told Jami I would hook up with her later, Jami told me to come. Jami said she was just kicking with her home boy from the studio and everything was cool.
>
> When Jami told me she was kicking it with someone from the studio, I thought she was hanging out with my man, Keith, because Keith is a rapper. I was over to one of my home boy's house when I talked to Jami. I left his crib and went to a pay phone to call Jami. I called Jami from the pay phone. After I finished talking to Jami, I went back to my boy's crib. I don't want to give my boy's name,

No. 12-70024

because I don't want him involved in this.  I stayed over at my boy's crib until I went back over to Jami's apartment.

It was about 4:00 or 5:00 in the morning when I got to Jami's apartment.  I knocked on the door and Jami opened the door and let me in.  I had felt the phone call from Jami was funny, because Jami usually tell[s] me who she has over to her place.  When I got to Jami's apartment, she let me in.  When I got inside the apartment was totally dark inside the apartment.  I could see a dude sitting on the sofa inside the living room.  I could see the guy because of the TV light from the TV.  The guy was a Hispanic dude with short, slick, black hair.  The dude was shorter than me, but he was stocky build.

When I saw the guy, I didn't trip but I was very uncomfortable. Jami sensed that I was uncomfortable. I didn't even sit down.  Jami went to lock the door behind me, and the dude started to get up.  I bolted down the hallway to the back rooms and pushed open the doors to the rooms to the back.  I was trying to see how many people were in the house.  I was trying to turn on some lights, but I didn't know where the switches were.

There was no one else in the apartment.  I went back up to the front of the apartment.  When I got to the front of the apartment, old boy tried to grab me, so I started fighting with him.  I was getting the best of the guy until Jami started helping him.  Jami grabbed me and started grabbing for my face.  That's when she scratched my face.  I felt like I was being overwhelmed and I didn't have the upper hand anymore, so I pulled my knife.  I pulled my knife and poked the dude with it.  After I poked him – I don't remember how many times I poked him, he took off.  He opened the door and bolted out of the apartment.  Jami was still there and she was still trying to fight.  She was scratching and grabbing at me and I was still slashing at her.  She grabbed me, so I started poking her.  She fell down and I ran out of there.

I ran across the apartment courtyard and was yelling for help.  I know that I had cut myself on my finger.  The dude was holding me, so I tried to slice his hand.  He pulled away and I sliced my own finger.  I didn't know I had all that blood on me.  I knew I had some blood on me, but not that much.  I didn't run when the police got

4

there, because I felt like I was a victim. I was the one being robbed, and I defended myself. I had no idea how bad I had hurt Jami. I wouldn't have hurt [her] that bad. When I walked down the stairs and started to cross the courtyard, the police ran up behind me. They were yelling, stop, or I'll shoot. I turned around and put my hands in the air. I told them I had no weapons, but I would not stop walking. I told them they would have to shoot me if they wanted me to stop walking.

Ten seconds later after that I got tackled. The officers cuffed me and one of them pepper sprayed me while I was laying on the ground handcuffed. I didn't tell the truth in my first statement, because I didn't want to admit I was buying drugs. I didn't want that to get out. This is all I know about this incident, this all happened in the City of San Antonio, Bexar County, Texas. This is the end of my two-page statement, I have read and understand this statement. I have signed this statement indicating it's true and correct. I gave this statement voluntarily without the promise of anything or being threatened.

I felt like I was the victim, so I didn't run, but know that the whole thing was over drugs so I didn't want to reveal that. I felt like it was going to be worked against me.

Preyor did not call any witnesses at the guilt-innocence phase, and the jury was instructed that Preyor had "elected not to testify." Trial counsel requested and obtained jury instructions on self-defense and the lesser-included offenses of murder and aggravated assault. The jury found Preyor guilty of capital murder.

At the punishment phase, the State presented evidence that Preyor had committed a prior drug offense in Syracuse, New York, in 1999. A Syracuse police officer testified that he discovered a bag containing nearly four ounces of crack cocaine, with a street value of approximately $10,000, when conducting a pat-down search of Preyor. Preyor fled, and another officer later tackled and handcuffed him. Preyor pled guilty to possession of a controlled substance in exchange for a one-year sentence and the dismissal of a charge of resisting

arrest.  Preyor told his probation officer that he had used cocaine since he was an adolescent, and that he had started using it consistently in 1998, when he had an affair with a woman who was a drug abuser.  Preyor also told his probation officer that the crack cocaine was for his own personal use.  However, when he was interviewed by a clinical psychologist, Dr. Murphy, prior to his capital murder trial, he acknowledged that he had been selling drugs.

After serving time for his drug offense in New York, Preyor moved to San Antonio, where he was joined by his wife and children.  About a month before the murder, on January 14, 2004, the police went to Preyor's apartment on a "family violence call."  Preyor was angry and he was pacing, yelling, and screaming, but he calmed down when his brother, a San Antonio police officer, arrived.  His wife, who was pregnant with their fourth child at that time, did not appear to be injured and said that she did not need assistance.

Preyor committed several minor disciplinary infractions while in the Bexar County Jail awaiting trial:  (1) possession of ten Tylenol tablets (eight more than the two that he was allowed to possess); (2) disobeying an order from staff; and (3) engaging in "loud, boisterous behavior or communication with other inmates."  The State also presented evidence that Preyor had the dates of his drug offense and the murder tattooed on his body.  He told Dr. Murphy that the tattoos were to remind him of mistakes that he did not want to repeat.

The jury found beyond a reasonable doubt that there was a probability that Preyor would commit criminal acts of violence that constituted a continuing threat to society, and that there were insufficient mitigating circumstances to warrant a sentence of life imprisonment.

On direct appeal, Preyor was represented by Michael Gross, one of the attorneys who had represented him at trial.  The Texas Court of Criminal Appeals affirmed Preyor's conviction and death sentence in an unpublished

No. 12-70024

opinion. *Preyor v. State*, No. AP-75119, 2008 WL 217974 (Tex. Crim. App. Jan. 23, 2008).

Terry McDonald was appointed to represent Preyor in state post-conviction proceedings. McDonald filed a state habeas application on behalf of Preyor in November 2007, raising the following claims:

(1) trial counsel was ineffective in failing to investigate the facts and develop a consistent trial strategy;

(2) trial counsel was ineffective in failing to investigate and present evidence that a burglary did not occur;

(3) trial counsel was ineffective in failing to have a correctional system expert appointed to aid the jury in understanding the degree of safety in prison society;

(4) the trial court failed properly to instruct the jury on mitigation;

(5) lethal injection is cruel and unusual punishment in violation of the Eighth Amendment; and

(6) his due process rights were violated because the same act involved in burglary was the act that killed the victim, in violation of the merger doctrine.

The trial court scheduled an evidentiary hearing on Preyor's first state habeas application. Prior to that hearing, notwithstanding that Preyor was represented by McDonald, Preyor's current federal habeas counsel, Brandi Estelle from Beverly Hills, California, who apparently had been hired by the family, filed another state habeas application in the trial court on December 1, 2008,[1] raising the following claims for relief:

---

[1] The record reflects that the state habeas application filed by Estelle on December 1, 2008 filing was preceded by several unsuccessful attempts by Estelle to be admitted pro hac vice. A state habeas application that appears to be substantially identical to the December 1, 2008 filing, was received by the Texas Court of Criminal Appeals on September 29, 2008. In a letter to the Court dated October 10, 2008, Estelle stated that the application received by the Court on September 29, 2008 "IS A NEW AND SEPARATE PETITION and should not be considered in conjunction with any other Petition filed by any other lawyer for Appellant. .

No. 12-70024

(1) trial counsel rendered ineffective assistance by failing to allow Preyor to testify;

(2) trial counsel rendered ineffective assistance by failing to investigate and adequately prepare for a defense at trial;

(3) trial counsel rendered ineffective assistance by failing to object during voir dire to the prosecutors' lecturing to prospective jurors, using brainwashing tactics instead of asking questions, and indoctrinating prospective jurors;

(4) trial counsel rendered ineffective assistance by failing to conduct voir dire regarding racial bias or prejudice;

(5) trial counsel rendered ineffective assistance by making inconsistent arguments in opening statement and closing arguments and by failing to produce any evidence to support the theory of self-defense asserted in closing arguments.

This December 1, 2008 application included the following paragraph:

> There is another habeas corpus petition pending, (No. AP-75119), and no request is made to consolidate that with this Petition, in that THIS Petition is based on ineffective assistance of APPELLATE COUNSEL. . . . The other Petition filed on behalf of the Defendant does not raise a colorable claim as to ineffective assistance of trial counsel. The within Petition, however, does.

Both McDonald and Estelle were present, on February 9, 2009, at the state evidentiary hearing held on Preyor's first state habeas application. At that hearing, McDonald stated that he had been informed by the Texas Court of Criminal Appeals that it was considering the application filed by Estelle as a second writ, "which is not provided for under Texas law." McDonald stated that he had spoken with Preyor and that it was his desire to have the writ filed by Estelle considered by the court. In response to questions from McDonald, Preyor

---

. . This Petition is based on grounds that Appellant suffered from INEFFECETIVE [sic] ASSISTANCE FROM TRIAL AND APPELLATE COUNSEL, which have never previously been asserted by Appellant."

testified under oath at the hearing that his family had retained Estelle to represent him and that he wished to proceed with the habeas application filed by Estelle, rather than the one filed by McDonald.

On March 26, 2009, the trial court submitted findings of fact and conclusions of law recommending that Preyor's first state habeas application be denied. The Texas Court of Criminal Appeals adopted all but one of the trial court's factual findings, adopted all of the trial court's legal conclusions, and denied Preyor's initial application on October 28, 2009. *Ex parte Taichin Preyor*, No. WR 72,660-01, 2009 WL 3474097 (Tex. Crim. App. Oct. 28, 2009). On that same date, the Texas Court of Criminal Appeals, construing the December 1, 2008 filing by Estelle as a subsequent application, dismissed it, pursuant to Texas Code of Criminal Procedure Article 11.071, Section 5(a), as an abuse of the writ. *Ex parte Taichin Preyor*, No. WR 72,660-02, 2009 WL 3474097 (Tex. Crim. App. Oct. 28, 2009).

Estelle filed a third state habeas application on behalf of Preyor in the trial court on December 21, 2009, raising a conflict of interest claim based on trial counsel's "fraternizing, laughing, and having a conversation" with the victim's stepfather during a recess at trial. Preyor asserted that this claim could not have been presented previously because the factual basis for it was not discovered by his counsel until February 9, 2009. This third application also appears to raise an ineffectiveness claim with regard to McDonald: It asserts that before withdrawing or abandoning his client, McDonald made no effort to either replace his petition with that of Estelle's or to supplement his application with the claims asserted in the application filed by Estelle on December 1, 2008. The Texas Court of Criminal Appeals dismissed the third state habeas application as an abuse of the writ on November 9, 2011. *Ex parte Taichin Preyor*, No. WR 72,660-03, 2011 WL 5438390 (Tex. Crim. App. Nov. 9, 2011).

No. 12-70024

Preyor filed a federal habeas petition on October 21, 2010. He alleged that trial counsel rendered ineffective assistance by (1) failing to allow him to testify at trial; (2) failing to investigate and adequately prepare for a defense at trial; (3) failing to object to the prosecutor's lecturing to prospective jurors and use of brainwashing tactics and indoctrination during voir dire; (4) failing to conduct voir dire regarding racial bias or prejudice; and (5) making false, inconsistent and confusing representations to the jury in opening statement and closing argument. He alleged that appellate counsel was ineffective in failing to present ineffective assistance of trial counsel claims on direct appeal. Finally, he alleged that his first state habeas counsel rendered ineffective assistance by (1) arguing trial strategy in the state writ; (2) failing to produce any evidence at the evidentiary hearing; (3) abandoning his client by failing to prepare proposed findings of fact and conclusions of law; and (4) failing to make a motion for appointment of federal habeas counsel.

Preyor filed an amended federal habeas petition on December 11, 2010, in which he added a claim that trial counsel had a conflict of interest based on his laughing and talking with the victim's stepfather, a prosecution witness, during a trial recess.

In its answer, the State asserted that most of Preyor's claims were procedurally defaulted because the state court had dismissed them as abusive. In his traverse to the State's answer, filed on June 28, 2011, Preyor requested an evidentiary hearing and asserted that trial counsel should have investigated the ownership of the shotgun found by police on the bumper of Preyor's vehicle and should have produced evidence of the local weather conditions and temperature at the time of the murder. He did not respond to the State's procedural default claims.

The district court held that most of Preyor's complaints of ineffective assistance of trial counsel were procedurally defaulted because they were raised

10

No. 12-70024

only in his second and third state habeas applications, both of which were dismissed as abusive by the state court. Alternatively, the district court addressed the claims on the merits, de novo, and held that Preyor's complaints about the performance of his trial counsel all were without merit. The district court held that Preyor was not entitled to an evidentiary hearing to develop new facts and new evidence in support of the claims the state habeas court rejected on the merits, and that he had failed to allege sufficient specific facts to warrant a federal evidentiary hearing with respect to the claims that the district court rejected on de novo review. The district court denied relief and denied a COA.

Preyor filed a motion for reconsideration, citing *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Although *Martinez* was decided on March 20, 2012, nearly three months before the district court's decision denying relief on June 15, 2012, Preyor waited until his motion for reconsideration to argue, for the first time, that ineffective assistance of initial state habeas counsel excused his procedural default. The district court denied the motion. It stated that under *Martinez*, only substantial complaints of ineffective assistance of trial counsel can be cause for a procedural default, and none of Preyor's complaints about the performance of his trial counsel are substantial because he failed to demonstrate either deficient performance or prejudice.

## II.

Preyor requests a COA for the following claims:

(1) Trial counsel rendered ineffective assistance by (a) failing to inquire into racial bias at jury selection; (b) failing to present any witnesses or evidence of self-defense; (c) withdrawing Preyor's only plausible defense; (d) presenting contradictory defense theories in opening statement and closing argument; and (e) having a conflict of interest as a result of inappropriate contact with the victim's stepfather.

No. 12-70024

(2) Trial counsel's decision not to call Preyor as a witness violated his constitutional right to testify.

To obtain a COA, Preyor must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. In making the decision whether to grant a COA, this Court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 327, 336. This Court cannot deny a COA because it believes that Preyor ultimately will not prevail on the merits of his claims. *Id.* at 337. On the other hand, "issuance of a COA must not be *pro forma* or a matter of course." *Id.* "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (brackets, internal quotation marks, and citations omitted).

Before addressing Preyor's claims, we first turn to consider whether Preyor has established cause to excuse the procedural default of most of his claims.

## A. Procedural Bar

The district court held that most of Preyor's claims are procedurally defaulted because he raised them for the first time in subsequent state habeas applications that were dismissed by the state court as abusive. Preyor contends

that the ineffective assistance of his first state habeas counsel, Terry McDonald, serves as cause to excuse the procedural default.

A federal court may consider the merits of a procedurally defaulted claim if the petitioner shows "cause for the default and prejudice from a violation of federal law." *Martinez*, 132 S. Ct. at 1316 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). In *Martinez*, the Supreme Court answered a question left open in *Coleman*: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." 132 S. Ct. at 1315. The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320. The standards of *Strickland v. Washington*, 466 U.S. 668 (1984), apply in assessing whether initial-review habeas counsel was ineffective. *Id.* at 1318.

Although Texas does not preclude prisoners from raising ineffective assistance of trial counsel claims on direct appeal, the Court held in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), that the rule of *Martinez* nevertheless applies to Texas cases because "the Texas procedural system–as a matter of its structure, design, and operation–does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 1921.

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, Preyor must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit,"

*Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

To establish ineffective assistance of his initial state habeas counsel, Preyor must show both that habeas counsel's performance – in failing to present the ineffective assistance of trial counsel claims in the first state habeas application – was deficient and that he was prejudiced by the deficient performance – that is, that there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application. *See Strickland*, 466 U.S. at 687. The *Strickland* standard also applies to Preyor's underlying ineffective assistance of trial counsel claims.

"[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal quotation marks and citations omitted).

No. 12-70024

With respect to the duty to investigate,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91. *See also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). The Supreme Court recently stated that these three post-*Strickland* cases, each of which granted relief on ineffective assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406-07 (2011). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 131 S. Ct. 770, 789-90 (2011). Preyor's trial counsel, as well as his state habeas counsel, were "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id*. at 789.

To demonstrate prejudice, Preyor

> must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citation omitted). This showing is intentionally difficult to satisfy: "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's

performance had no effect on the outcome . . . . Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Richter*, 131 S. Ct. at 791-92 (citations omitted).

Even if Preyor establishes that ineffective assistance of his initial state habeas counsel constitutes cause for the default of his ineffective assistance of trial counsel claims, "[a] finding of cause and prejudice does not entitle [him] to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320. In this case, the district court considered the merits of the procedurally defaulted claims and held that Preyor was not entitled to relief because he had failed to demonstrate that his trial counsel rendered deficient performance or that he was prejudiced. Because the district court addressed the merits of Preyor's ineffective assistance of trial counsel claims, it is arguable that Preyor has received the relief available to him under *Martinez* and *Trevino.* And, as we have noted, when it denied Preyor's motion for reconsideration, the district court held that *Martinez* offered no sustenance for Preyor because his ineffective assistance of trial counsel claims were not substantial, because they lacked merit.

We conclude that, in this case, it makes no difference to the outcome whether the ineffectiveness of Preyor's first state habeas counsel excused the procedural default of Preyor's ineffective assistance of trial counsel claims, because reasonable jurists could not debate the district court's conclusion that Preyor's claims are not substantial or its alternative conclusion, on de novo review, that he failed to demonstrate that trial counsel rendered deficient performance and that he was prejudiced.

We now turn to address each of Preyor's COA requests.

No. 12-70024

## B.  Ineffective Assistance of Trial Counsel

### 1.  Failure to Inquire into Racial Bias at Jury Selection

Preyor asserts that this is a racially sensitive case because he is black and the victim, Tackett, was white, and that trial counsel rendered ineffective assistance by failing to conduct a reasonable inquiry into racial bias and prejudice of prospective jurors.

The district court held that this claim is procedurally defaulted because it was first presented in Preyor's second habeas petition, which the state court dismissed as an abuse of the writ, and that Preyor had failed to establish cause and prejudice to excuse the default.  Alternatively, the district court held that the claim lacks merit.  The district court concluded that Preyor had failed to allege any facts showing that racial issues were inextricably intertwined with the facts of the offense or the circumstances of trial, and detailed the conclusory nature of Preyor's claim:  (1) although Preyor argued that his trial counsel should have questioned venire members about their relationships with black people, interracial couples, and their feelings about black people generally, he did not identify any member of the venire who should have been questioned in such a manner; (2) he did not identify any venire member whose questionnaire responses, physical appearance, demeanor, or background information suggested that he or she might have racially biased or prejudiced views that would impair his or her ability to render a verdict based solely on the evidence and the law; (3) he did not allege or identify any venire member who was excused for cause because of racial bias or prejudice; (4) he did not allege any specific facts showing that racial bias or prejudice was so prevalent in the community at the time of his trial as to require questioning every venire member about racial bias or prejudice; and (5) he did not allege any specific facts showing that his race or ethnicity or the race or ethnicity of his victims played any role in his offense or in the outcome of the trial, and identified no evidence showing that his offense

17

No. 12-70024

was racially motivated.  The district court held that, under such circumstances, trial counsel cannot reasonably be faulted for failing to question each member of the venire about racial bias or prejudice.

Reasonable jurists would not debate the district court's conclusion that Preyor failed to allege any specific facts showing that trial counsel should have been aware at the time of voir dire of the potential for racial bias or prejudice among the venire.  As the district court pointed out, there is no per se rule requiring voir dire on racial bias or prejudice in every case in which the defendant and the victim are of different races.  *Ristaino v. Ross*, 424 U.S. 589, 596 n.8 (1976).  Instead, whether such voir dire is necessary requires "an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as (they stand) unsworne.'" *Id.* at 596 (quoting Coke on Littleton 155b (19th ed. 1832)).  Reasonable jurists would agree with the district court that Preyor failed to show the existence of any such circumstances.  Accordingly, Preyor's request for a COA for this claim is denied.

### 2. Failure to present witnesses or evidence of self defense and right to testify

Preyor argues that self-defense was his only plausible defense and that trial counsel rendered ineffective assistance by failing to present any witnesses or evidence to support that defense.  He does not identify any evidence that should have been presented other than his own testimony.[2] This claim is largely duplicative of Preyor's claim that trial counsel "withdrew" the defense of self-

---

[2] Preyor also speculates – without any supporting evidence – that, if trial counsel had investigated the shotgun found on the bumper of his vehicle, the investigation would have shown that the gun was connected to a prosecution witness.  He does not explain, however, how such evidence would have supported his claim that he cut Tackett's throat with a knife in self-defense.

18

defense, and that counsel's decision not to call him as a witness violated his constitutional right to testify. We therefore address all of these claims together.

Preyor asserts that he wanted to testify at trial and was assured by defense counsel that he would be called to testify, but that defense counsel made the decision not to call him as a witness and thus prevented him from testifying. Preyor argues that because he was the only other person present at the scene, his testimony was essential to the theory of self-defense and that the defense was essentially "withdrawn" when counsel did not call him to the witness stand. He contends that defense counsel's decision not to allow him to testify deprived him of his constitutional right to take the stand and also deprived him of a potentially meritorious defense. He contends further that the admission into evidence of his statement was not an adequate substitute for his testimony.

The district court referred to the strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment and concluded that Preyor had not presented any specific factual allegations or evidence showing that trial counsel did anything which prevented Preyor from exercising his constitutional right to testify on his own behalf at the guilt-innocence phase of his capital murder trial, or that the decision not to have him testify was anything other than an informed, voluntary decision made by him in consultation with his trial counsel.[3] Specifically, Preyor did not present an affidavit stating (1) that his trial counsel failed to advise him of his right to testify at trial, (2) that he ever advised his trial counsel that he wished to testify, and (3) what information he was prepared to offer had he been called to testify.

The district court noted that Preyor's version of the events surrounding his fatal assault on Tackett was admitted into evidence in the form of his written statement, which could not be cross-examined. If Preyor had testified at trial in

---

[3] The jury charge stated specifically that Preyor had elected not to testify.

a manner consistent with his written statement, the district court found that it is likely that he would have been subjected to damaging cross-examination about (1) why he said in his statement to police that Tackett opened the door and let him into her apartment, when photographs of the door indicated that it had been broken in;[4] (2) why numerous witnesses heard a woman screaming but no one claimed to have heard him; (3) why he wore gloves and brought a knife to Tackett's apartment; (4) why he disposed of his bloody gloves and knife by throwing them over a fence not far from where his vehicle was parked and then returned to the apartment complex courtyard (a fact omitted from his written statement to police); (5) why he resisted when the police tried to secure him in handcuffs; (6) why he suffered no serious injuries, while Garza sustained a serious chest wound and Tackett was sliced or stabbed numerous times over her body and had numerous defensive wounds; and (7) why he remained in Tackett's apartment after Garza left. The court concluded that, viewed objectively, there were reasonable strategic reasons why trial counsel may have believed that calling Preyor to testify at the guilt-innocence phase of trial would have proven more risky than potentially beneficial. The district court also pointed out that if Preyor had testified, he could have been cross-examined about his prior conviction for possession of almost $10,000 worth of crack cocaine and his admissions that he was again dealing drugs after his move to San Antonio. The district court concluded that Preyor had failed to carry his burden of overcoming the presumption that the decision by trial counsel not to call him to testify at

---

[4] Preyor argued in the district court that trial counsel should have presented evidence that the door to Tackett's apartment was broken out from the inside, rather than broken in from the outside. The district court held that any such attempt would have been futile because photographs admitted into evidence at trial show a door still on its hinges, an undamaged exterior door frame, and an interior door frame shattered to pieces, suggesting force was applied to the exterior of the door.

trial constituted adequate assistance and was made in the exercise of reasonable professional judgment.

The district court also held that Preyor could not establish prejudice. Based on its independent review of the entire record, the district court held that there is no possibility, much less a reasonable probability, that, but for the failure of trial counsel to call Preyor to testify at trial, the outcome of either phase of the trial would have been different.

The district court noted that in his pleadings, Preyor claimed that he would have testified that: (1) he was attacked by Tackett and Garza shortly after his arrival at Tackett's apartment; (2) shortly before his arrival at her apartment, Tackett directed him in a telephone conversation to come over to her apartment; (3) both Tackett and Garza appeared to be "under the influence"; (4) Tackett immediately snatched his money clip from his hand; and (5) the shotgun found on the bumper of his vehicle had absolutely no connection to him.

The district court observed that the jury already was aware, from Preyor's written statement, of his assertions that he telephoned Tackett the evening before the murder and arranged to visit her apartment and that Tackett and Garza attacked him when he arrived at her apartment. Thus, his first two pieces of proposed testimony offered nothing of substance and would have been cumulative of the information contained in his written statement. Further, Garza admitted in his trial testimony that he used cocaine and drank a large amount of beer on the night of the murder, and the medical examiner testified that Tackett's blood contained a metabolite of cocaine but was negative for alcohol and other drugs. Thus, testimony by Preyor that Tackett and Garza were "under the influence" also would have been cumulative of other evidence before the jury. If Preyor had testified that Tackett grabbed his money clip when he entered her apartment, the district court found that the prosecution would likely have cross-examined him as to why police found his money clip next to his

vehicle in the apartment complex's parking lot and why he failed to mention this detail when he described the events at Tackett's apartment for police in his written statement (which does not mention an attempted robbery by Tackett and Garza). Such testimony also would have raised the likelihood of cross-examination about what happened to the money, in the light of the fact that the money clip police found in the parking lot contained no cash, no cash is visible in the photographs from Tackett's apartment, the medical examiner did not find any cash at the autopsy, and there is no evidence that police officers or evidence technicians found any cash inside Tackett's apartment. Thus, any testimony by Preyor about the alleged theft of his money clip by Tackett would likely have raised more difficult questions for Preyor than the defense could have hoped to gain from such testimony.

Reasonable jurists could not debate the district court's conclusions that Preyor's allegation that counsel refused to allow him to testify is conclusory and that he failed to establish deficient performance or prejudice with respect to his claims regarding the presentation of evidence of self-defense, including his testimony. Accordingly, we deny Preyor's requests for a COA for these interrelated claims.

### 3. Presentation of Contradictory Defense Theories

Preyor contends that trial counsel rendered ineffective assistance by presenting inconsistent defense theories in his opening statement, in which counsel suggested that David Pointer, Tackett's former boyfriend, was the killer and that Preyor was not present, and in closing argument, in which he claimed that Preyor killed Tackett in self-defense.[5]

---

[5] It is arguable that this claim was presented in Preyor's first state habeas application and is not procedurally defaulted. In any event, reasonable jurists would not debate the district court's decision, on de novo review, that it fails on the merits.

The district court held that the factual premise of this claim is inaccurate because in his opening statement, trial counsel did not explicitly argue either that Preyor was not present at the scene on the night of Tackett's murder or that David Pointer was the real perpetrator. The district court characterized the opening statement as pointing an accusatory finger toward Pointer and theorizing a motive for Pointer to murder Tackett. The district court also found that Preyor misrepresented the contents of counsel's closing argument.

The district court rejected Preyor's contention that, because Pointer had an alibi and was a witness for the prosecution, trial counsel's reference to Pointer as a possible suspect undermined trial counsel's credibility. The district court pointed out that Pointer's alibi was not air-tight, because his alibi witness was asleep at the time of the murder. In addition, during cross-examination of Pointer, defense counsel elicited evidence, consistent with defense counsel's opening statement, of Pointer's obsession with Tackett and his depression following the demise of their relationship.

Based upon its review of the entire record, the district court concluded that there was no inconsistency between trial counsel's opening statement and closing argument. In the opening statement, trial counsel attempted to focus the jury's attention on the relationship between Tackett and Pointer. In closing argument, trial counsel argued that Garza, acting under the influence of alcohol and cocaine, had mistaken Preyor for Pointer and had attacked Preyor without warning; that the fatal wound to Tackett was delivered without much force, as Preyor attempted to restrain her and protect himself from Garza's attack; and that Preyor did not intentionally cause Tackett's death as he defended himself.

Reasonable jurists would not find the district court's assessment of this claim debatable or wrong. We therefore deny Preyor's request for a COA for this claim.

No. 12-70024

#### 4. Conflict of Interest

Preyor's conflict of interest claim is based on an allegation that, during a recess at the guilt-innocence phase of the trial, Michael Gross, one of the attorneys who represented him at trial, talked and laughed with the victim's stepfather, Charles Dickinson, who was a witness for the prosecution. Preyor contends that Gross's contact with Tackett's stepfather in such a social and friendly manner during the trial violated his Sixth Amendment right to conflict-free representation.

The district court held that this claim was procedurally defaulted and, alternatively, that it has no merit. The district court pointed out that Preyor had alleged no specific facts establishing that Gross had any interpersonal contact with Tackett's stepfather other than the one occasion described in his pleadings; he presented no allegations that Gross was involved in a friendship with any member of Tackett's family; he presented no allegations or evidence showing that Gross engaged in any topic of conversation with Dickinson inappropriate for discussion between a criminal defense counsel and a prosecution witness; he cited no authority to support the contention that a criminal defense lawyer is constitutionally prohibited from engaging in conversation with a relative of his client's victim; and he did not identify any action trial counsel could have undertaken to cross-examine Dickinson more thoroughly or differently or to otherwise elicit any helpful testimony from him.[6] The district court held that Preyor's conclusory assertions that counsel fraternized, socialized, and laughed with Dickinson, bereft of any facts showing what they said to each other, failed to establish that Gross operated under a conflict of interest.

---

[6] We note that Preyor's lead counsel, John Economidy – not Gross – cross-examined Dickinson.

For the first time in this court, Preyor presented the unnotarized affidavits of Margaret Mendez and Nathaniel Johnson, in which they claim they witnessed the incident and gave that information to Preyor's current counsel in February 2009 at the state court evidentiary hearing. We do not consider new evidence presented for the first time on appeal. In any event, the affidavits do not help Preyor because the affiants do not describe the contents of the conversation between Gross and Dickinson and offer no new information that would call into question Gross's loyalty to Preyor.

Reasonable jurists would not find the district court's assessment of this claim to be debatable or wrong, and we therefore deny Preyor's request for a COA.

### III.

In sum, we conclude that reasonable jurists would not debate the district court's conclusions regarding any of Preyor's claims. He offered no evidence – not even his own affidavit – to support his conclusory allegation that he was denied his constitutional right to testify. As the district court noted, his allegations of ineffective assistance of trial counsel are all either conclusory or are based on misrepresentations of the record. Furthermore, reasonable jurists would all agree that Preyor was not prejudiced. His theory of self-defense was inconsistent with the physical evidence, and his actions in disposing of the knife and bloody gloves and resisting arrest all are inconsistent with self-defense. Because Preyor has not made a substantial showing of the denial of a constitutional right, his application for a COA is

DENIED.